ALTIZER COAL LAND COMPANY, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

D. E. HENSLEY AND NELL HOCK HENSLEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 63895, 64288.    Filed October 15, 1958.

*L. E. Woods, Jr., Esq.*, and *Robert K. Emerson, Esq.*, for the petitioners.

*Hubert E. Kelly, Esq.*, for the respondent.

OPINION.

LeMire, *Judge:* The question presented is whether the profits accruing to the respective petitioners from the sale of certain real estate in the taxable years should be taxed as ordinary income or as capital gain. Sec. 117 (a) and (j) of the Internal Revenue Code of 1939 and secs. 1221 (1) and 1231 (b) (1) (B) of the 1954 Code. So far as here material, the applicable sections of the 1939 and the 1954 Codes are substantially the same. If the real estate was held primarily for sale to customers in the ordinary course of petitioners' trade or business, the profits are to be taxed as ordinary income as determined by the respondent.

The record establishes that Altizer had acquired 2,900 acres of timber and coal lands in Logan County, West Virginia. Aside from the transactions here in controversy, the business of Altizer was the collection of royalties, and wheelage from its properties. In 1912, it leased approximately 1,100 acres of Avon Coal Company for a term of 40 years for the purpose of mining coal. By various assignments, Buffalo became the owner of the lease.

Throughout the years but prior to 1929, the various lessees under the 1912 lease constructed houses and other buildings which they rented to miners to insure a labor supply. The area was known as Riley

Camp or the Town of Riley. By 1950, the coal underlying the land covered by the 1912 lease was approaching exhaustion. Because of this situation, Buffalo was liquidated, and its assets including the 1912 lease were transferred and conveyed to its two stockholders, Riley and Hensley, who thereupon formed a partnership.

The 1912 lease contained a provision to the effect that upon its termination, the lessor had the option to purchase the buildings erected by the lessees upon the leased properties. Hensley, on behalf of the partnership, offered to purchase the land occupied by the buildings for $75,000, or to sell the buildings to Altizer for $75,000. Altizer had no facilities for operating the rental properties and declined to purchase them but made a counteroffer to sell the land to the partnership for $125,000. Altizer, for the purposes of aiding the negotiations and for the benefit of a report to its stockholders, had an appraisal made. The land and improvements were appraised at $168,000. Later another appraisal was made which placed the total valuation at approximately $200,000.

The parties being unable to agree on a price agreed to sell the lands and buildings jointly. Hensley was selected to make the sale at prices agreed upon and the proceeds were to be divided 60 per cent to Altizer and 40 per cent to the partnership. It was agreed that the present occupants and former employees of Buffalo were to be given preference in purchasing the houses and buildings.

The lots were formally platted on the basis of existing fences, streets, and understood boundaries. The survey aroused the interest of the occupants who made inquiry at the office of the partnership and were informed that upon completion of the survey the houses and buildings would be for sale.

During the years 1951 to 1954, 79 sales of houses and buildings were made in 66 transactions for a total sales price of $166,850. Of the sales, 59 were made to occupants or former employees of Buffalo. Most of the sales were upon the installment basis.

No capital improvements were made, although the houses were kept in a tenantable condition until sold. There was no solicitation, no advertising, and no "For Sale" signs erected and no promises to make any improvements.

Neither Altizer nor the partnership purchased or sold other real properties. No agents were employed and no one connected with Altizer or the partnership was licensed as a real estate broker or real estate salesman.

Petitioners contend that they were not in the real estate business; that the houses and lots were not property primarily held for sale to customers in the ordinary course of their trade or business, and that they were merely passively liquidating their respective interests

in the properties sold in the only feasible way the circumstances of their diverse ownership permitted.

The respondent admits that the original purpose for acquiring the land upon which Riley was located was not to engage in any business apart from the production of coal and the collection of royalties, and that the sales in question were brought about by the desire of Altizer and the partnership to liquidate their respective interests.

The respondent contends that as the sales were the result of a joint undertaking, Altizer and the partnership were engaged in a joint venture, and the real properties were held primarily for sale to customers in the ordinary course of the business of the joint venture. The necessary element of such a contract is the intent of the parties to create the partnership relationship. We do not think, under the circumstances existing here, that the mere unification of the respective interests of the parties in order to facilitate an orderly liquidation of their interests warrants the inference that the parties intended to create a joint venture or partnership relationship.

The respondent also contends that the liquidation argument made by petitioners loses its potency, since the parties were primarily motivated by the profit that would result from a sale of their interests jointly. We think the liquidation was in good faith. Due to the nature of the particular assets involved, it is obvious that they could not be liquidated in any other manner than the method adopted without great financial sacrifice. In view of the fact that the aggregate sales price received was less than the aggregate of the value the parties placed upon the respective interests while negotiations were in progress, the profit motive seems to lack significance.

The respondent also argues that a liquidation may constitute a business. We recognize that there are many cases which discuss the question whether the liquidation is carried on in such a manner as to constitute a business. There is no definite formula for deciding cases of that type, and each case must be determined upon its own particular facts. Under such circumstances, we think it would serve no constructive purpose to attempt to reconcile the cases relied upon by the parties as supporting their contentions.

Under the facts and circumstances presented in the instant case, we are convinced that the respective petitioners were engaged in an orderly liquidation of their capital assets, and such properties were not primarily held for sale to customers in the ordinary course of any trade or business. The assets having been held for more than 6 months, the gains realized from such sales are not taxable as ordinary income. On this issue the petitioners are sustained.

Other issues have been disposed of by concession or agreement and they will be given effect in the recomputations under Rule 50.

*Decisions will be entered under Rule 50.*